UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
———————————————————————————————x

**Index No.: 2:24-CV-05842-JS-ST**

DORA CHAMPION, Individually and as Guardian of "GC",
a minor child under the age of 16 years,

*Plaintiff/Claimant*

**SECOND AMENDED
COMPLAINT**

-against-

OVZIE CANNON, Youth Services Specialist,
BERNARD JOHNSON, OCFS Caseworker,
ANITA SAPIO Facility Manager at BRC,
EDWARD FIGUEROA, Facility Director at BRC,
LOSECA AUSTRAL, PREA Compliance
Manager at BRC, Sarah Chin-Rokanova, R.N.
Tiffney Nerkowski Graf, Nurse Administrator at BRC,
"JOHN DOES" 1 - 10 and "JANE DOES"
1 – 10 such persons being employed as Staff, Supervisors,
and/or Administrators at the BRENTWOOD RESIDENTIAL
CENTER during the time "GC" was a resident at that facility.

*Defendants.*
———————————————————————————————x

Plaintiffs DORA CHAMPION, Individually and as Guardian of GC, a female minor child under

16 years at the time of the events herein, ("Guardian" or "Claimant/Plaintiff") by her attorneys HEILIG

BRANIGAN, LLP, as and for her Verified Complaint against defendants OVZIE CANNON a Youth

Services Specialist at Brentwood Residential Center, BERNARD JOHNSON an OCFS caseworker,

ANITA SAPIO Facility Manager at BRC, EDWARD FIGUEROA, Facility Manager of Brentwood

Residential Center ("Figueroa"), LOSECA AUSTRAL, in her capacity as PREA Compliance Manager of

Brentwood Residential Center ("Austral"), Sarah Chin-Rokanova, R.N. ("Chin-Rokanova"), Tiffney

Nerkowski Graf, Nurse Administrator at BRC ("Graf"), and "JOHN DOES 1 – 10" and "JANE DOES 1 –

10" such persons being employed as Staff, Supervisors, and/or Administrators at the Brentwood

Residential Center during the time GC was confined as a resident at that facility, allege, upon knowledge

with respect to their acts and on information and belief as to other matters, as follows:

**NATURE OF THE ACTION**

1. Plaintiffs brings this civil rights action, after GC, while confined in the custody and under the supervision of Brentwood Residential Center ("BRC"), operated under the auspices of New York State ("New York") and the New York State Office of Children and Family Services ("OCFS"); was groomed, raped, sexually exploited, sexually harassed, impregnated and drugged by Ovzie Cannon while he was employed as a Youth Support Specialist ("YSS") by BRC, OCFS and New York.

2. On numerous occasions between December 2022 and February 2023, Ovzie Cannon ("Cannon"), while he was working at Brentwood Residential Center, an in-patient Residential Center for female children between the ages of twelve and eighteen years of age, and overseen by OCFS, ignored all prescribed duties and rules of his trusted position, to solicit and perform sexual relations with GC, a minor child under 16 years of age.

3. The incidents alleged herein have been investigated by the New York State Justice Center for the Protection of People with Special Needs ("Justice Center"), and their findings have been included as **Exhibit "A"** to the instant Complaint.

PARTIES

4. At all times herein, Dora Champion is and was the legal guardian of GC, a minor child of 16 years of age. Dora Champion maintains a residence in Amityville, New York.

5. At all times herein, GC was and is a minor child, whose permanent home is with Dora Champion, her legal guardian.

6. At the time of the occurrences at BRC as related herein, GC was a minor child of under 16 years of age, under the care and custody of New York State, the Office of Children and Family Services, the Brentwood Residential Center.

7. At all times herein, minor child GC was entrusted to the care of BRC by order of the New York State Family Courts.

8. At all times herein, OCFS is and was a department of the New York State government, charged with

tasks including overseeing Residential Centers that are established for the care and well-being of, among other things, at-risk young people within the geographic region of New York State.

9. At all times herein, BRC is and was a residential treatment community, operated under the auspices of OCFS, predominantly for the care of female minor children between 12 and 18 years of age, who have been adjudicated juvenile delinquents.

10. At all times herein Ovzie Cannon was employed as a Youth Support Specialist ("YSS") by BRC, OCFS and New York.

11. At all times herein Bernard Johnson ("Johnson") was and is a Caseworker employed by the Office of Children and Family Services.

12. At all times herein, Anita Sapio ("Sapio") was and is the Facilities Manager of BRC.

13. At all times herein, Edward Figueroa (Figueroa) was and is the Facilities Director of BRC.

14. At all times herein, Loseca Austral ("Austral") was and is the Facility PREA Compliance Manager of BRC.

15. At all times herein, Sara Chin-Rokanova ("Chin-Rokanova") was and is a registered nurse at BRC.

16. At all times herein, Tiffney Nerkowski Graf, was a Nurse Administrator at BRC ("Graf").

17. At all times herein, Sapio, Figueroa, and Austral were and are the chief administrators of BRC, responsible for the physical and mental well-being of the inmates of that facility.

18. At all times herein, minor child GC was entrusted to the care of BRC, by order of the New York State Family Courts.

19. At all times herein, Ovzie Cannon was an individual over the age of eighteen years and was employed by New York State, the Office of Children and Family Services, and the Brentwood Residential Center as a Youth Support Specialist.

20. At all times herein, John Does 1 – 10 and Jane Does 1 – 10 were and are Administrators, Supervisors and Staff at Brentwood Residential Center, tasked with protecting and caring for the minor children placed in their charge by New York State and the Office of Children and Family Services.

## JURISDICTION AND VENUE

21. This Court has subject-matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §§1331 and 1343(a). This Court has jurisdiction to award nominal, compensatory and punitive damages and attorneys' fees under 28 U.S.C. §2201 and 42 U.S.C. §§1983 and 1988.

22. Venue is proper pursuant to 28 U.S.C. §1391(b)(2) because the events giving rise to Plaintiff's claims occurred within the Brentwood Residential Center in Dix Hills, New York, which is in the Eastern District of New York.

## OPERATION OF THE BRC

23. Conduct at BRC is regulated by the Policy and Procedure Manual (PPM) of OCFS, the policy and procedures established by the Prison Rape Elimination Act (PREA), and the policy and procedures established by the BRC.

24. PPM section 3247.03 states that the policy of OCFS is to see that youth are supervised in a professional and diligent manner that provides for their safety, to promote the reintegration of the youth to family, home and community, and to maintain good order at the facility. Additionally, '[a]ll adults who interact with youth are expected to adhere to appropriate practices in childcare and treatment standards and maintain professional respectful boundaries regardless of whether a youth agrees to or initiates conduct that is inappropriate."

25. Within a residential facility, such as BRC, OCFS in PPM 3247.40 Section II, states that a Facility Director is the chief administrator of an OCFS facility.

26. A Facilities Manager is directly above the Director in the chain of command (Id.).

27. An Administrator on Duty is an employee designated to provide on-duty, on-grounds, administrative coverage and direction to staff regarding day-to-day operations and functions (Id.).

28. An Administrator on Call is the facility director (or designated subordinates), who is expected to be immediately available by telephone to provide directions to staff about facility operations.

4

29. Sexual conduct is prohibited at OCFS/BRC, both between residents and between residents and staff, by PREA, PPM and the policy and procedures manual of the BRC.

30. Additionally, PPM 3247.60, presents OCFS policy regarding reducing the risk of suicide at OCFS facilities. That policy mandates that observation of a resident must be continual and, when a resident is sleeping, observation must be from the doorway of the room (PPM 3247.60 (III) (B) (3)).

31. The policy and procedures of the BRC and OCFS require that the Facilities Manager, Facilities Director, and Administrators on a daily basis inspect the facility to insure that it and its staff are operating in conformity with the relevant policy and procedures. Inspections are to be random and include inspections on nights and weekends.

## RELEVANT FACTS

32. There has been and continues to be a high rate of sexual abuse of women in custody by prison/facility staff.[1]

33. GC is particularly vulnerable to sexual victimization, having met the criteria for confirmation as a human trafficking victim in New York State by the Office of Temporary and Disability Assistance ("OTDA").

34. GC has an intellectual disability and mental illness and has been victimized by sexual abuse and exploitation since she was 14 years old.

35. GC cannot consent to sexual activity because of her age, psychiatric disabilities, and cognitive limitations.

36. On or about October 7, 2022, GC was declared a juvenile delinquent by the New York State Family Court – Suffolk County.

---

[1] Chandra Bozelko, *Sexual Violence in Women's Prisons Reaches "Constitutional Proportions." Will Lawmakers Step In?*, Ms. Magazine (April 23, 2020); https://msmagazine.com/2020/04/23/sexual-violence-in-women's-prisons-reaches-constitutional-proportions-will-lawmakers-step-in/ "Incarcerated women are 30 times more likely to be raped than free women. Even though women account for less than 10 percent of inmates, their reports account for three-quarters of assaults, and almost three quarters of staff are men.")

37. As a result of the Court's findings, on November 26, 2022, GC was remanded to the custody of OCFS/BRC for an indeterminate amount of time.

38. On November 29, 2022, GC turned 15 years old.

39. The BRC facility is a residential care center for females between the ages of 12 and 18 years of age.

40. BRC inhabitants ("residents" or "inmates") are offered educational programming which meets New York State Education Department Guidelines. Alternative High School programs and Test Assessing Secondary Completion pursuits are also offered to qualified candidates.

41. Youth counseling, medical services, job readiness training, recreational activities, mental health services, and religious services are all available to the inmates, on site.

42. The facility is low security, but self-contained. Family members may visit the inmates on weekends, but the inmates do not typically leave the grounds, except in special circumstances.

43. All inmates at BRC must attend counseling sessions.

44. In December 2022, while a resident at BRC, GC expressed thoughts of self-harm and suicide and was put on "suicide watch".

45. Upon information and belief, it was Cannon who reported that GC had suicide ideations, and he was responsible for her being put on suicide watch.

46. At BRC an individual remains on suicide watch until a clinician determines that they are no longer a danger to themselves.

47. A person on suicide watch should be evaluated regularly by a clinician, preferably daily.

48. Upon information and belief, GC was not evaluated by a mental health professional after she was put on suicide watch.

49. A suicide watch requires round-the-clock one-on-one supervision of GC.

50. Cannon supervised GC overnight.

51. In contravention of BRC/OCFS policy Cannon did not remain at the doorway of GC's bedroom.

52. Cannon entered GC's room, brought a TV into the room and shut the door.

53. Supervisors on duty and other staff would have seen the closed door and should have stopped the activity. Both the closed door and the person in the room contravened BRC/OCFS policy and procedure for persons on suicide watch.

54. The Administrator on duty was required to walk through the areas of the facility, approximately every 15 minutes.

55. Despite knowing of the high risk of sexual abuse of female prisoners in general, and the especially significant risk to GC due to her OTDA status, BRC allowed Cannon, a male YSS, to conduct one-on-one supervision with GC.

56. Prior to his employment as a YSS, Cannon had a criminal record as a convicted violent felony offender.

57. In 2006 Ovzie Cannon was convicted of Attempted Robbery in the Second Degree, a Class D Violent Felony.

58. Upon information and belief, Ovzie Cannon was sentenced to, and served, a two-year sentence for the above referenced conviction at Willard Drug Treatment Center ("Willard DTC").

59. Willard DTC was a specialized state prison, closed since March 2022, which specialized in treatment for drug-addicted convicts.

60. On the New York State OCFS website employment section, under the description of a Youth Support Specialist, it reads, in part:

> **Background Investigation/Justice Center Review**
> Prospective appointees will be:
>
> - checked against the Staff Exclusion List (SEL) maintained by the Justice Center for the Protection of People with Special Needs. Prospective employees whose names appear on the SEL as having been found responsible for serious or repeated acts of abuse or neglect will be barred from appointment and may have their names removed from the eligible list(s) for the title(s) if applicable;
>
> - investigated through a Criminal Background Check (CBC). All convictions must be reported**. Conviction of a felony or misdemeanor or any falsified or omitted information may bar appointment or result in removal after appointment *(emphasis added)*. Each case will be determined on its own merits, consistent with the applicable provisions of state and federal laws; Prospective

employees will be fingerprinted in order to obtain a record of their criminal history information, and may be required to pay any necessary fees; and . . .

61. Prior to his employment at BRC, Cannon was the subject of an inquiry at another OCFS facility, believed to be Finger Lakes Residential Facility, because he brought contraband into the facility for use by a resident. He was allowed to transfer to BRC although Facilities Director Figueroa knew of the disciplinary issue.

62. One-on-one supervision at BRC involves only the YSS and the resident (in this case, GC).

63. Upon information and belief, Cannon began grooming GC immediately upon introduction, telling her she "was cute" and she 'reminded him of his daughter'.

64. Upon information and belief, shortly after beginning one-on-one counseling, Cannon began making sexual overtures to GC.

65. Cannon continued his attentions to GC, beginning a systematic cycle of rape, assault, sexual exploitation, sexual harassment, battery and general child endangerment.

66. Cannon both threatened and provided rewards to GC to ensure her silence.

67. The rewards received by GC from Cannon included (1) allowing GC the use of his cellphone and (2) supplying GC with 'edibles', food products containing cannabinoids, neither of which are allowed by BRC rules.

68. The threats entailed removal of those rewards.

69. Upon information and belief, Cannon raped GC whenever he was on duty, believed to be approximately 47 days.

70. On or about February 18, 2023, GC informed her Mother, that "another girl" had been raped at BRC by a male staff member and that the girl was afraid to tell anyone. The Mother told GC that the girl should tell someone at the facility immediately.

71. The next day, GC relayed to her Mother that she was, in fact, the "other girl", that she had informed personnel at the facility, and that she had been raped every day she met with Cannon and he took over her care.

72. Plaintiff contacted GC's OCFS caseworker, Bernard Johnson, and the New York State Justice Center for the Protection of People with Special Needs ("Justice Center") and informed them of GC's claims.

73. Plaintiff also notified the Suffolk County Police.

74. On information and belief, on the evening of the report by Plaintiff the police went to the BRC, but they were not permitted to enter the facility.

75. Upon information and belief, Facility Director Figueroa directed that the police were not allowed to enter the BRC.

76. Upon information and belief, the next day the police were allowed to enter the facility, but, at the direction of Facility Director Figueroa, they were not allowed to speak with any staff at the facility.

77. The policy of BRC/OCFS states that if there is a sexual assault of any type the victim is to immediately be sent to an emergency room or to see a doctor for examination and testing.

78. BRC did not enforce this policy but instead attempted to handle complaints "in house".

79. Upon information and belief, the policy to not send alleged victims of sexual abuse out for a medical examination was made by Facility Manager Sapio and Facility Director Figueroa, and was followed by the Administrators on Duty.

80. Upon information and belief, the morning after GC's complaint, Graf, the day Nurse Administrator, came on duty and learned about the report by GC and that GC had not been sent out to see a medical professional

81. Upon information and belief, Graf the day Nurse Administrator, learned that Facilities Director Figueroa, after consulting with Facilities Manager Sapio, directed that GC not be sent out and that the matter should be handled internally.

82. Upon information and belief, Graf was informed directly from Facilities Director Figueroa that he and Facilities Manager Sapio directed her not to send GC out to see a medical professional.

83. Upon information and belief, Graf determined that BRC/OCFS policy and the PREA required that GC be sent out to see a doctor and she ordered and made arrangements for GC to be taken to the emergency room.

84. Upon information and belief, Graf was thereafter told by Facility Manager Sapio that she was not a team player because she had sent GC out to see a doctor.

85. On February 20, 2023, Plaintiff Mother was notified that GC had been given a urine drug test, but it was inconclusive and would be repeated the following day.

86. Plaintiff Mother was also informed that a blood test and pregnancy test would be administered to GC on February 21, 2023.

87. As a result of those tests, it was discovered that GC was pregnant.

88. GC was immediately released to Plaintiff Mother's custody.

89. At the time of her release from BRC, GC was 6 ½ weeks pregnant, although she had been in BRC custody for three (3) months.

90. GC endured a clinical abortion on March 18, 2023.

91. On March 27, 2023 Cannon was indicted in Suffolk County New York Criminal Court on five (5) criminal counts in the matter of People v. Cannon, IND. # 70767-23. Cannon was accused of two (2) counts of Rape in the Third Degree, a Class E Felony, two (2) counts of Criminal Sexual Act in the Third Degree, a Class E Felony, and a single count of Endangering the Welfare of a Child, a Class A Misdemeanor.

92. On December 1, 2023, before the Honorable Karen M. Wilutis, Ovzie M. Cannon pled guilty to one count each of Rape in the Third Degree, Criminal Sexual Act in the Third Degree, and Endangering the Welfare of a Child.

93. On January 17, 2024, Ovzie Cannon was offered the chance to speak prior to his sentencing. Cannon apologized to the Court and to OCFS for his crimes. After being reminded by the Court, he also apologized to his victim, who was unnamed in Court.

94. Cannon was sentenced for his crimes as follows: COUNT 1- Rape in the Third Degree - two and a half years in prison followed by 10 years post-release supervision; COUNT 3 – Criminal Sexual Act in the Third Degree – two and a half years in prison followed by 10 years of post-release supervision; COUNT 5 – Endangering the Welfare of a Child – 364 days in jail. All sentences are to run concurrently. Cannon was also required by the Court to sign a permanent Order of Protection requiring him to stay away from GC through July 17, 2044. A copy of the Certificate of Conviction in that case is attached to this Complaint as **Exhibit "B"**.

95. Plaintiffs Mother and GC seek to vindicate their constitutional rights through this action.

## Sexual Abuse of Women Incarcerated in New York State Prisons

96. GC was a minor child under the age of 16 years old at the time of these occurrences, certified as a victim of human trafficking, intellectually disabled and with a history of mental illness. When she expressed suicidal thoughts during counseling, BRC and the OCFS allowed a male counselor to treat GC one-on-one, and allowed him full, unfettered access to GC with no supervision, either personal or via recordings of their meetings.

97. Because of the risk and incidence of sexual abuse and retaliation in prison settings[2], the federal government, the District of Columbia, and all 50 states have enacted statutes criminalizing any sexual contact between prisoners and correctional staff, See, e.g., NY Penal Law §130.05(3)(e).  Awareness of the risk of custodial sexual abuse led to the enactment of the Prison Rape Elimination Act ("PREA"), 34 U.S.C. 30301 et seq. (2003).

98. The PREA applies to juveniles in OCFS custody.

99. Female prisoners are a particularly vulnerable population and face a heightened risk of sexual abuse by male officers[3]. As many as 60 to 80 percent of women prisoners have been physically or sexually

---

[2] "More than 80,000 prisoners each year are sexually victimized during incarceration but only about 8% report victimization to correctional authorities." Sheryl P. Kubiak et al., *Sexual Misconduct in Prison: What Factors Will Affect Whether Incarcerated Women Will Report Abuses Committed by Prison Staff?, 41 Law and Hum Behav. 361, 361 (2017).*

[3] Supra note 8 at 362.

abused prior to their incarceration[4].

**Brentwood Residential Center 2022 PREA Report**

100. In the BRC PREA Facility Audit Report-2022, BRC was rated on compliance with the National Prison Rape Elimination Act standards. The purpose of these standards is to eliminate rape, sexual assaults, and sexual harassment from the prison/facility system. At that time, BRC was found to be in general compliance with the rules and standards. The 2022 PREA Report for BRC is attached hereto as **Exhibit "C"**.

101. However, Page 22, paragraph 1 of the BRC-PREA states: "Video Surveillance and Staffing Plan must be completed . . . each year". It goes on to state: In determining adequate staffing levels and the need for video monitoring, facilities must take into consideration: "[5] all components of the facility's physical plant (including "blind spots and/or areas where staff or youth may be isolated").

102. BRC is equipped with 66 video surveillance cameras, with 14 of those cameras located outdoors around the facility.

103. There are 4 monitors in the control room and staff to review these cameras 24 hours a day, seven days a week.

104. In addition, Defendants Figueroa and the Administrator on Duty both have access to the monitor feeds from their office computers.

105. Yet, in some fashion, Defendant Cannon was still able to isolate GC on a daily basis for the purpose of raping and sexually abusing her, and was able to provide her with his cellphone and cannabinoids without anyone noticing.

106. In the same PREA Report, on page 23, section (e), states that "Intermediate level or higher level supervisors **must conduct and document unannounced rounds** (emphasis added) to identify and deter staff sexual abuse and sexual harassment. Such unannounced rounds must be implemented for

---

[4] Alison Hastings et al.; *Keeping Vulnerable Populations Safe Under PREA: Alternative Strategies to the Use of Segregation in Prisons and Jails*, (April 2015)

all shifts (day and night). Facility staff are prohibited from alerting other staff members that these supervisory rounds are occurring, unless these announcements are related to legitimate operational functions of the facility."

107.  Again, Defendant Cannon was able to rape, sexually assault and sexually harass GC on a daily basis for almost two months, and neither his absence, nor hers, were noted or questioned by staff and/or supervisors.

**Plaintiff was at High Risk of Sexual Assault Upon Entering BRC**

108.  Although under the age of 16 years old when incarcerated at BRC, GC had a previous history of being sexually abused.  GC has an intellectual disability and suffers from mental illness.  She was certified in November of 2022 as a Victim of Human Trafficking by New York ODTA. GC receives medication and counseling to assist her in dealing with her mental health issues.

109.  In enacting PREA in 2003 Congress found that experts conservatively estimate that at least 13 percent of United States inmates have been sexually assaulted, many repeatedly.  Congress further found that inmates with mental illness are at increased risk of sexual victimization[5].

110.  To address these concerns, Congress established the National Prison Rape Elimination Commission to establish a set of national standards for detecting, preventing, reducing and punishing prison rape.

111.  The National PREA Standards were published in 2009 and became effective on August 12, 2012[6].

112.  Under the National PREA standards, inmates should be screened at intake, initial classification, and all subsequent reviews to determine the risk of their becoming a victim. They are evaluated based on 1) whether there is a physical or mental disability; 2) their physical build; 3) prior history of victimization; and 4) the inmate's own sense of vulnerability[7].

**Defendants Cannon, Sapio, Figueroa, Austral, Graf, and John Does and Jane Does Were Aware of the Risk of Sexual Abuse to Female Inmates.**

---

[5] 34 U.S.C. §30301
[6] U.S. Dep't of Just., *Implementing the PREA Standards, Protecting Inmates, and Safeguarding Communities,* 5, https://bja.ojp.gov/sites/g/files/xyckuh186/files/media/document/BJA-2008-1720.pdf.
[7] 28 C.F.R. §115.41.

113. The BRC-PREA Report, on page 24, discusses "Limits to cross-gender viewing and searches". Specifically, the BRC-PREA makes clear that, "Except in emergency situations, personal searches must be conducted by staff of the same gender as the inmate being searched." In the case of BRC, which only houses female inmate/residents, **only** females may perform personal searches, and contraband inspections. The Report goes on to state that "Opposite gender viewing of youth under circumstances when breasts, buttocks, or genitalia would normally be exposed (shower/hygiene time, performing bodily functions, and changing clothes) is prohibited. Male staff must announce their presence on entering living areas by announcing "Male on the unit" or stating their name loud enough for all to hear.

114. When GC was placed on suicide watch at BRC, the decision was made to have a male Youth Services Specialist, Cannon, to work with her one-on-one. The State's guidelines, as outlined in Paragraph 60 above, require background checks for a Youth Support Specialist. Upon information and belief, Cannon has a record as a violent offender, but was still assigned to work one-on-one with GC.

115. Upon information and belief, one-on-one treatment meant that GC's care and treatment was under the control of Cannon, without video or personal supervision. Cannon had virtually unlimited access to GC.

116. Defendants were or should have been aware that Congress enacted PREA in 2003 to address and reduce the high risk of sexual assault in prison.

117. Loseca Austral is the PREA compliance officer at the BRC.

118. Upon information and belief, training regarding PREA did not occur until after the complaint made by GC and her Mother.

119. Defendants were or should have been aware that New York enacted N.Y. Penal Law §130.05(3)(e) to address the high rate of sexual assault within New York prisons and correctional facilities. This statute makes clear that an inmate/resident cannot legally consent to any sexual act with DOCCS staff, and it criminalizes any sexual activity between DOCCS staff and an inmate/resident.

120. Defendants were or should have been aware that OCFS has a "zero tolerance" policy for sexual activity with or sexual harassment of an inmate/resident.

121.  Defendants were or should have been aware that they have an obligation under PREA to lessen the risk of sexual assault, exploitation and harassment of female inmates/residents within their facilities.

122.  Defendants were or should have been aware that certain characteristics render inmates/residents more vulnerable to sexual abuse in prison, including mental health issues, cognitive disabilities, and prior experience of abuse, all of which characteristics were and are present in GC.

**Defendants Sapio, Figueroa, the Administrators on Duty, Austral, Graf, John Does and Jane Does Failed to Enforce Policies to Prevent Sexual Abuse by Staff and Failed to Enforce Existing Policies**

123.  Defendants Sapio, Figueroa, the Administrators on Duty, Austral, Graf and John Does and Jane Does knew or should have known that there were guidelines in place to prevent the occurrence of sexual abuse of inmates, but they failed to follow their own guidelines.

124.  Despite knowing the risk and frequency of sexual misconduct by staff inherent in the corrections system, Defendants Sapio, Figueroa, the Administrators on Duty, Austral, Graf, and John Does and Jane Does recklessly disregarded those risks and failed to protect GC from harm.

125.  Defendants Sapio, Figueroa, the Administrators on Duty, Austral, Graf, and John Does and Jane Does inadequately supervised and trained staff, thereby placing female inmates/residents at a heightened risk of sexual assault and abuse.

126.  Defendants Sapio, Figueroa, the Administrators on Duty, Austral, Graf, and John Does and Jane Does failed to enact new policies or enforce existing policies intended to protect female inmates/residents from sexual abuse by staff.

127.  Defendants Sapio, Figueroa, the Administrators on Duty, Austral, Graf, and John Does and Jane Does supervised male staff behavior with female inmate/residents no differently from the way they would supervise same-gender supervision of inmate/residents, and failed to provide any specific training for staff on how to manage female inmate/residents.

128.  Defendants Sapio, Figueroa, the Administrators on Duty, Austral, Graf, and John Does and Jane Does permitted male staff to have unfettered access to female inmate/residents in unmonitored areas for extended periods of time.

129. Upon information and belief, Defendants Sapio, Figueroa, the Administrators on Duty, Austral, Graf, and John Does and Jane Does failed to implement BRC-PREA measures to reduce the risk of sexual misconduct between male staff and female inmate/residents, and to prevent misconduct from occurring, escalating or continuing. These include but are not limited to measures such as real-time video review of video camera feeds; periodic review of camera footage; use of electronic recording devices; and, of utmost importance, frequent, varied and unannounced rounds by supervisory officials.

130. To the extent where Defendants Sapio, Figueroa, the Administrators on Duty, Austral, Graf, and John Does and Jane Does required installation and use of surveillance cameras, the use of those cameras for supervision and/or investigation was grossly inadequate to protect GC.

131. For areas for which there are privacy concerns, such as medical units, clinics, bathing rooms, bedrooms, etc., Defendants Sapio, Figueroa, the Administrators on Duty, Austral, Graf, and John Does and Jane Does allowed Cannon virtually unlimited access to GC, with no female staff monitoring the areas and no unannounced rounds by supervisory officials.

132. Defendants Sapio, Figueroa, the Administrators on Duty, Austral, Graf, and John Does and Jane Does failed to prohibit male staff from being alone with GC in isolated, unmonitored areas where sexual abuse is easily accomplished.

133. Upon information and belief, Defendants Sapio, Figueroa, the Administrators on Duty, Austral, Graf, and John Does and Jane Does failed to enforce adequate rules and policies that dictated the content and substance of limited supervisory rounds.

134. Upon information and belief, there is no requirement in place that supervisory staff must see each staff member on duty, check in verbally with staff, speak with inmates or ask if they have problems, or any requirement that supervisors observe the entire area, inmates and staff for any misconduct, or make any notations on what they observe.

135. Upon information and belief, supervision did not include observation and counseling or discipline for staff evincing warning signs of sexual abuse, including engaging in personal conversations with inmate/residents and sharing personal items with inmate/residents.

136. Defendants Sapio, Figueroa, the Administrators on Duty, Austral, Graf, and John Does and Jane Does failed to require and perform unpredictable supervisory rounds. Supervisors routinely conducted rounds in a predictable manner, failing to vary their time, frequency and point of entry, leaving staff able to predict periods of time when they could be virtually assured that they could engage in misconduct with inmates without being discovered.

## JUSTICE CENTER INVESTIGATION

### Incident date 2/20/23 - BRC

137. The Justice Center investigated the allegation of Category 1 Sexual Abuse against Cannon and the allegation against Cannon was SUBSTANTIATED (see Exhibit A1, allegation 1) in that GC was found to have been subjected to sexual contact and/or conduct in violation of Article 130 of the New York State Penal Law.

138. The Justice Center investigated the allegation of Category 2 Neglect against Cannon and the allegation against Cannon has been held SUBSTANTIATED (see Exhibit A1, allegation 2) in that Cannon failed to maintain professional boundaries with GC.

139. The Justice Center investigated the allegation of Category 2 Neglect against Brentwood Rehabilitation Center and the allegation against BRC was SUBSTANTIATED because "substantial systemic problems were identified during the investigation including inadequate management, training and supervision that exposed GC to harm or risk of harm" (see Exhibit A1, allegation 3).

140. It should be noted that there were an additional 19 allegations addressed in the report of the February 20 2023 incident each marked "Unsubstantiated", and all alleging either "Neglect" or "Obstruction".

## DAMAGES

141. Each of the aforementioned acts by each Defendant directly and proximately caused GC to suffer the following: violation of civil rights, loss of freedom of expression, loss of enjoyment of freedom of expression, loss of privacy, loss of enjoyment of privacy, loss of personal liberty and freedom to physically move about, loss of enjoyment of personal liberty and freedom to physically move about, humiliation, emotional and physical injury including a clinical abortion, pain and suffering, and great

and extreme mental anguish.

142.  GC endured, and continues to endure, substantial pain and suffering due to each and every act and

omission of all Defendants, and each of them.

**FIRST CLAIM FOR RELIEF AGAINST DEFENDANTS**
**CANNON, SAPIO, FIGUEROA, AUSTRAL**
**JOHN DOES 1-10 and JANE DOES 1-10,**
**VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)**
**Fourth Amendment (seizure of GC person)**

143.  Plaintiff repeats and realleges paragraphs 1 through 142 as if each were more fully set forth herein.

144.  This cause of action arises under 42 U.S.C. § 1983, wherein Plaintiff seeks to redress a deprivation

under color of law of a right, privilege, or immunity secured to GC by the Fourth Amendment to the

United States Constitution.

145.  The Fourth Amendment protects GC from being unlawfully detained or imprisoned.

146.  The defendants seized GC by declaring that she was suicidal, failing to provide clinical evaluations,

and thereby keeping her restrained in a room with one-on-one monitoring by Cannon.

147.  The defendants additionally allowed Cannon to stay with GC with the bedroom door closed, thereby

confining her in her room with Cannon

148.  GC was confined in her room in violation of her rights guaranteed by the Fourth amendment to the

United States Constitution.

**SECOND CLAIM FOR RELIEF AGAINST DEFENDANT**
**CANNON,**
**VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)**
**Fourteenth Amendment (right to bodily integrity)**

149.  Plaintiff repeats and realleges paragraphs 1 through 148 as if each were more fully set forth herein.

150.  This cause of action arises under 42 U.S.C. § 1983, wherein Plaintiff seeks to redress a deprivation

under color of law of a right, privilege, or immunity secured to GC by the Fourteenth Amendment to

the United States Constitution.

151.  Plaintiff has a right to bodily integrity free from governmental interference under the Fourteenth

Amendment to the United States Constitution.

152.  The unlawful, unwanted, and harmful touching of GC by Cannon, constituting rape, sexual assault, batteries and excessive force, was without lawful basis, reasonable suspicion, probable cause or warrant, or any recognized exceptions thereto, or justification or excuse, and was thus unreasonable and in violation of GC's Fourteenth Amendment rights.

**THIRD CLAIM FOR RELIEF AGAINST DEFENDANTS
CANNON, SAPIO, FIGUEROA, AUSTRAL,
CHIN-ROKANOVA, JOHN DOES 1-10 and JANE DOES 1-10
VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)**

153.  Plaintiff repeats and realleges paragraphs 1 through 152 as if each were more fully set forth herein.

154.  This cause of action arises under 42 U.S.C. § 1983, wherein Plaintiff seeks to redress a deprivation under color of law of a right, privilege, or immunity secured to GC by Fourteenth Amendments to the United States Constitution.

155.  Defendants, and each of them. acted as described herein above, with the agreement, permission, ratification, knowledge. and approval of each other to violate GC's civil rights afforded under the United States Constitution by acts of commission and omission.

156.  The Defendants failed to provide proper medical care, failed to properly monitor both GC and the facility, failed to prevent Cannon form his interactions with Gc which were visible and obvious, failed to follow the policy and procedure of both the BRC and OCFS, failed to train, failed to discipline, failed to inspect and provide security, and attempted to prevent outside knowledge of their actions by keeping any corrective action 'In house".

**FOURTH CLAIM FOR RELIEF AGAINST DEFENDANTS
SAPIO, FIGUEROA, AUSTRAL,
JOHN DOES 1-10 and JANE DOES 1-10
VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)**

157.  Plaintiff repeats and realleges paragraphs 1 through 156 as if each were more fully set forth herein.

158.  This cause of action arises under 42 U.S.C. § 1983, wherein Plaintiff seeks to redress a deprivation under color of law of a right, privilege, or immunity secured to GC by the Fourteenth Amendment to the United States Constitution.

159.  Defendants violated GC's constitutional rights, as alleged *supra*, by creating and maintaining the following unconstitutional customs and practices, *inter alia*

160.  Plaintiff alleges Defendants were supervisors at BRC and had positions that let them make and enforce policy for the BRC.

161.  The Defendants caused the BRC to have a *de facto* policy, custom, or practice of inadequately investigating their employees upon complaints of misconduct or claims for damages.

162.  Plaintiff alleges Defendants have a *de facto* policy, custom, or practice of failing to discipline, failing to investigate, and of retaining personnel who falsely detain persons in violation of their constitutional rights.

163.  Plaintiff alleges Defendants have a *de facto* policy, custom, or practice of condoning, ratifying, failing to discipline, failing to investigate, and of retaining personnel who use excessive and/or unjustified force upon persons with whom they come into contact in violation of constitutional rights.

164.  Plaintiff alleges that Defendants' policies or customs caused and were the moving force and/or affirmative link behind some or all of the violations of GC's constitutional rights at issue in this case.

165.  Plaintiff believes and therefore alleges that that these policies, practices, customs and procedures are intentional and/or the result of deliberate indifference on the part of Defendants, by and through their decision makers.

166.  The foregoing unconstitutional customs and practices were a direct and legal cause of harm to GC.

167.  Plaintiff specifically alleges that Defendants' policy, custom, and/or practices, as described herein, were within the control of Defendants and within the feasibility of Defendants to alter, adjust and/or correct, so as to prevent some or all of the unlawful acts and injury complained of herein by Plaintiff.

168.  The Justice Center has investigated the allegation of Category 2 Neglect against Brentwood Rehabilitation Center and the allegation against BRC was SUBSTANTIATED due to substantial systemic problems identified during the investigation including inadequate management, training and supervision that exposed GC to harm or risk of harm and mitigated individual staff culpability (see Exhibit A, allegation 3).

### FIFTH CLAIM FOR RELIEF AGAINST DEFENDANTS
### SAPIO, FIGUEROA, AUSTRAL,
### JOHN DOES 1-10 and JANE DOES 1-10
### VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)
### Failure to Train, Supervise, Discipline or Correct

169. Plaintiffs repeat and reallege paragraphs 1 through 168 as if each were more fully set forth herein.

170. This cause of action arises under 42 U.S.C. § 1983, wherein Plaintiffs seek to redress a deprivation under color of law of a right, privilege, or immunity secured to GC by the Fourteenth Amendment to the United States Constitution.

171. Plaintiffs allege Defendants were supervisors at BRC and had positions that let them make and enforce policy for the BRC.

172. The Defendants violated GC's constitutional rights, as alleged *supra*, by creating and maintaining the following unconstitutional customs and practices, *inter alia*

173. Plaintiffs believe and therefore allege that that Defendants have failed to properly train, supervise, and/or discipline employees, officers, managers, supervisors and staff as to the legal requirements and protections applicable to persons as set forth in the United States and New York State Constitutions and other laws; and

174. Plaintiff alleges that these failures amount to a *de facto* policy and are intentional and/or the result of deliberate indifference on the part of Defendants, by and through their decision makers. These include but are not limited to Defendants and their subordinates, as necessary to further these improper policies, practices, customs and procedures.

175. The foregoing unconstitutional customs and practices were a direct and legal cause of harm to GC.

176. Defendants acted in a supervisory capacity with respect to the incidents involving GC. In that capacity, Defendants acted intentionally, maliciously, in conscious disregard, and/or with deliberate indifference to the rights of GC. Plaintiff believes and therefore alleges that Defendants acted in this manner, at least in part, to avoid liability and financial exposure for the BRC, and to maintain its reputations and the reputation of OCFS.

177. These supervisory failures of Defendants directly caused and contributed to Plaintiff's damages.

178. Plaintiff specifically alleges that Defendants' policy, custom and practice, as described *supra*, was within each of their control and within the feasibility of each of them to alter, adjust, and/or correct so as to prevent some or all of the unlawful acts and injury complained of herein by Plaintiff and GC.

179. The Justice Center has investigated the allegation of Category 2 Neglect against Brentwood Rehabilitation Center and the allegation against BRC was SUBSTANTIATED due to substantial systemic problems identified during the investigation including inadequate management, training and supervision that exposed GC to harm or risk of harm and mitigated individual staff culpability (see Exhibit A, allegation 3).

**SIXTH CLAIM FOR RELIEF AGAINST DEFENDANTS
SAPIO, FIGUEROA, AUSTRAL,
JOHN DOES 1-10 and JANE DOES 1-10
FOURTEENTH AMENDMENT TO THE
UNITED STATES CONSTITUTION**

180. Plaintiffs repeat and reallege paragraphs 1 through 179 as if each were more fully set forth herein.

181. In failing to perform the required background checks on Cannon prior to his employment Defendants acted in an unreasonable manner and violated GC's clearly established constitutional right to be free from punishment.

182. In performing the required background checks, but then employing Cannon anyway, Defendants operated in an unreasonable manner and violated GC's clearly established constitutional right to be free from punishment.

183. The BRC is a residential community for juveniles that, under both state and federal law, is not a jail and in which punishment is not allowed.

184. The confinement and rape of GC fulfilled no rehabilitative purposes.

185. The failure to monitor and properly supervise GC fulfilled no rehabilitative purposes.

186. In not properly supervising or overseeing Cannon's care for GC, Defendants operated in an unreasonable manner and violated GC's clearly established constitutional right to be free from punishment.

187. In allowing Cannon to have unfettered access to GC at all times and allowing him unlimited

unsupervised time with GC, Defendants operated in an unreasonable manner and violated GC's clearly established constitutional right to be free from punishment.

188. In failing to protect GC from rape, sexual exploitation and sexual harassment by Cannon, Defendants conduct constituted deprivation of GC's liberty interest and a violation of her bodily integrity in violation of the Fourteenth Amendment to the United States Constitution.

189. As a direct and proximate cause of these deliberate acts and omissions, GC suffered severe physical and psychological harm.

**SEVENTH CLAIM FOR RELIEF AGAINST DEFENDANT
CANNON
FOURTEENTH AMENDMENT TO THE
UNITED STATES CONSTITUTION**

190. Plaintiff repeats and realleges paragraphs 1 through 189 as if each were more fully set forth herein.

191. Cannon was assigned specifically to take over the treatment of GC. GC was a troubled youth with thoughts of suicide and self-harm.

192. Rather than treat GC's condition, Cannon used his unsupervised access to GC as an opportunity to groom, rape, sexually exploit, sexually harass, impregnate and drug GC, an inmate and minor child legally unable to consent to sexual relations with him.

193. In not treating GC's mental health issues Cannon operated in an unreasonable manner and violated GC's clearly established constitutional right to be free from punishment.

194. In physically and sexually abusing GC, Cannon operated in an unreasonable manner and violated GC's clearly established constitutional right to be free from punishment.

195. In raping GC throughout January and February 2023, Defendant Cannon acted willfully and wantonly for his own sexual gratification and sadistic purposes.

196. In impregnating GC, Defendant Cannon acted willfully and wantonly for his own sexual gratification and sadistic purposes.

197. There was no penological justification for the conduct set forth herein above.

198. In not treating GC's mental problems and by physically and sexually abusing GC Cannon violated

GC's right to be free from any punishment that was not related to a therapeutic goal, and he violated her right to bodily integrity.

199. As a direct and proximate cause of these deliberate acts and omissions, GC suffered severe physical and psychological harm.

200. The New York State Justice Center for the Protection of People with Special Needs ("Justice Center") has investigated the allegation of Category 1 Sexual Abuse against Cannon and the allegation against Cannon was SUBSTANTIATED (see Exhibit A, allegation 1) in that GC was found to have been subjected to sexual contact and/or conduct in violation of Article 130 of the New York State Penal Law.

**EIGHTH CLAIM FOR RELIEF AGAINST DEFENDANTS
SAPIO, CANNON, FIGUEROA, AUSTRAL,
CHIN-ROKANOVA
JOHN DOES 1-10 and JANE DOES 1-10
FOURTEENTH AMENDMENT TO THE
UNITED STATES CONSTITUTION
Failure To Protect**

201. Plaintiff repeats and realleges paragraphs 1 through 200 as if each were more fully set forth herein.

202. In not properly supervising or overseeing Cannon's care for GC, Defendants operated in an unreasonable manner and violated GC's clearly established constitutional right to be free from punishment, abuse, the use of drugs and protection of her bodily integrity.

203. In allowing Cannon to have unfettered access to GC at all times and allowing him unlimited unsupervised time with GC, Defendants operated in an unreasonable manner and violated GC's clearly established constitutional right to be free from punishment, abuse, the use of drugs and protection of her bodily integrity.

204. The one-on-one policy followed by BRC, without supervision as in the case of GC, allowed the grooming, rape, sexual exploitation, sexual harassment, and doping of a female minor child to continue for almost two months, and resulted in that minor child's unwanted pregnancy, necessitated a clinical abortion, and deepened GC's psychological and mental health issues.

205. As a direct and proximate result of these deliberate acts and omissions, GC suffered severe physical and psychological harm.

206. In failing to protect GC from rape, sexual exploitation, sexual harassment and drugging by Cannon, Defendants' conduct constituted a violation of GC's rights as guaranteed by the Fourteenth Amendment to the United States Constitution.

207. The Justice Center has investigated the allegation of Category 2 Neglect against Cannon and the allegation against Cannon has been held SUBSTANTIATED (see Exhibit A, allegation 2) in that Cannon failed to maintain professional boundaries with GC.

208. The Justice Center has investigated the allegation of Category 2 Neglect against Brentwood Rehabilitation Center and the allegation against BRC was SUBSTANTIATED due to substantial systemic problems identified during the investigation including inadequate management, training and supervision that exposed GC to harm or risk of harm and mitigated individual staff culpability (see Exhibit A, allegation 3).

### NINTH CLAIM FOR RELIEF AGAINST DEFENDANTS SAPIO, CANNON, FIGUEROA, AUSTRAL, CHIN-ROKANOVA, JOHN DOES 1-10 and JANE DOES 1-10 FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION Failure To Protect

209. Plaintiff repeats and realleges paragraphs 1 through 208 as if each were more fully set forth herein.

210. Residential supervisors and staff, including contractual staff, have a duty to report any allegations of sexual abuse or sexual harassment of an inmate/resident, and to report any actual knowledge or reasonable belief concerning any incident of sexual abuse, sexual harassment or the existence of an inappropriate relationship between a staff member and an inmate/resident.

211. This duty extends to the point of periodically checking on the whereabouts and occupation of inmate/residents throughout the day, and where and how they are spending their time.

212. Residential supervisors and staff, including contractual staff, have a duty to take reasonable steps to protect inmate/residents in their care and custody and to intervene when the constitutional rights of inmate/residents are violated.

213. Defendants violated this duty when they deliberately failed to keep watch over GC and her daily

routine. Care and control of GC was handed to Cannon by the other Defendants, and he used that opportunity to rape, sexually assault, sexually harass and dope GC himself.

214. Defendants violated this duty when they ignored changes in GC's behavior signaling cannabinoid use and sexual activity.

215. The deliberate failures and omissions of these Defendants to protect GC were unreasonable and violated Plaintiff's clearly established constitutional right to be free from punishment, abuse, the use of drugs and protection of her bodily integrity.

216. In failing to protect GC from rape, sexual exploitation and sexual harassment by Cannon, Defendants conduct constituted a failure to protect under the Fourteenth Amendments of the U.S. Constitution.

217. As a direct and proximate cause of these deliberate acts and omissions, GC suffered severe physical and psychological harm.

**TENTH CLAIM FOR RELIEF AGAINST DEFENDANTS**
**SAPIO, FIGUEROA, AUSTRAL, THE ADMINISTRATORS ON DUTY**
**JOHN DOES 1-10 and JANE DOES 1-10**
**FOURTEENTH AMENDMENT TO THE**
**UNITED STATES CONSTITUTION**
**Failure To Implement Policies and Practices to Avoid Violations of**
**Constitutional Rights and Failure to Train/Supervise Employees**

218. Plaintiff repeats and realleges paragraphs 1 through 217 as if each were more fully set forth herein.

219. At the time of the events at issue Defendants Sapio, Figueroa, Austral and the Administrators on Duty were aware or should have been aware of the risk and incidence of sexual abuse and retaliation in prison/facility settings.

220. Defendants were aware of the PREA standards laid out in the policies of BRC.

221. Defendants were or should have been aware of GC's previous history of sexual exploitation and human trafficking.

222. Defendants nevertheless failed to implement or enforce policies to protect GC from sexual abuse, rape, sexual assault and doping by Defendant Cannon.

223. Defendants failed to prevent Cannon from interacting with GC without adequate camera coverage, recording instruments or supervision.

224. The deliberate failures and omissions of these Defendants to protect GC were unreasonable and violated Plaintiff's clearly established constitutional right to be free from cruel and unusual punishment.

225. In failing to protect GC from rape, sexual exploitation and sexual harassment by Cannon, Defendants conduct constituted a violation of GC's rights as guaranteed by the Fourteenth Amendment to the United States Constitution.

226. As a direct and proximate cause of these deliberate acts and omissions, GC suffered severe physical and psychological harm.

227. Defendants Sapio, Cannon, Figueroa, Austral and the Administrators on Duty were deliberately indifferent to the serious risk of sexual violence and harassment of GC, a female minor child under their charge, at the hands of Cannon, an individual who had been charged with her care.

### ELEVENTH CLAIM FOR RELIEF AGAINST DEFENDANTS SAPIO, FIGUEROA, AUSTRAL, FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION Deliberate Indifference

228. Plaintiff repeats and realleges paragraphs 1 through 227 as if each were more fully set forth herein.

229. At the time of the events at issue Defendants Sapio, Figueroa, and Austral were aware or should have been aware, of the risk and incidence of sexual abuse and retaliation in prison/facility settings.

230. Defendants Sapio, Figueroa, and Austral were directly and personally responsible for the safety of inmate/residents at BRC.

231. Defendants Sapio, Figueroa, and Austral were aware of the PREA standards laid out in the policies of BRC.

232. Defendants Sapio, Figueroa, and Austral were or should have been aware of GC's previous history of being a victim of sexual exploitation and human trafficking.

233. Defendants Sapio, Figueroa, and Austral nevertheless failed to implement or enforce policies to protect GC from sexual abuse, rape, sexual assault and doping by Defendant Cannon.

234. Defendants Sapio, Figueroa, and Austral failed to prevent Cannon from interacting with GC in areas without adequate camera coverage, recording instruments or supervision.

235. Defendants Sapio, Figueroa, and Austral failed to physically supervise, inspect or oversee areas where GC was being treated by Cannon, even though no cameras were in place in those areas.

236. Defendants Sapio, Figueroa, and Austral created a custom and unspoken policy, through their actions and failures to act, in which staff did not report and turned a blind eye to warning signs of an improper relationship with and manipulation of GC by Cannon.

237. Defendants Sapio, Figueroa, and Austral were deliberately indifferent to a serious risk to the safety of all female inmates at BRC, and GC in particular.

238. The deliberate indifference of Defendants Sapio, Figueroa, and Austral led to the sexual assault of GC.

239. As a direct and proximate cause of these deliberate acts and omissions, GC suffered severe physical, emotional and psychological harm.

240. Defendants Sapio, Figueroa, and Austral were deliberately indifferent to the serious risk of sexual violence and harassment of GC, a female minor child under their charge, at the hands of Cannon, an individual who had been charged with her care.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request judgment against Defendants, jointly and severally, as follows:

Awarding Plaintiffs compensatory damages in an amount to be determined at trial;

Awarding Plaintiffs punitive damages in an amount to be determined at trial but which is sufficient to deter Defendants from future unlawful conduct;

Awarding Plaintiffs costs, disbursements and reasonable attorney's fees; and

Granting Plaintiffs such other and further relief as the Court deems just and proper.

Dated: Holbrook, New York
    February 18, 2026

HEILIG BRANIGAN, LLP
Attorneys for Plaintiffs/Claimants

_____
PHILIP J. BRANIGAN, Esq.

4250 Veterans Memorial Highway
Suite 111-East
Holbrook, New York 11741
(631) 750-6888
(631) 750-6880 (fax)
hbmlaw@optimum.net

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____x    Index No.: **2:24-CV-05842-JS-ST**

Dora Champion, Individually and as Guardian of "GC",
a minor child under the age of 16 years,

**VERIFICATION**

*Plaintiffs/Claimants*

-*against*-

OVZIE CANNON, Youth Services Specialist,
BERNARD JOHNSON, OCFS Caseworker,
ANITA SAPIO Facility Manager at BRC,
EDWARD FIGUEROA, Facility Director at BRC,
LOSECA AUSTRAL, PREA Compliance
Manager at BRC, Sarah Chin-Rokanova, R.N.
Tiffney Nerkowski Graf, Nurse Administrator at BRC,
"JOHN DOES" 1 - 10 and "JANE DOES"
1 – 10 such persons being employed as Staff, Supervisors,
and/or Administrators at the BRENTWOOD RESIDENTIAL
CENTER during the time "GC" was a resident at that facility.

*Defendants*

_____x

DORA CHAMPION, Individually and as Guardian of "GC", a minor child under the age of 16 years at the

time the events occurred, affirms pursuant to CPLR 2016, and states that she is the Claimant in this action

and the foregoing claim is true to her own knowledge, except as to matters raised upon information and

belief, and as to those matters she believes them to be true. The grounds of her belief as to all matters not

stated upon her knowledge are papers and/or documents in the file.

February    , 2026

Dora Champion, Individually
and as Guardian of GC, a minor child
under the age of 16 years.