**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

Index No.: 2:24-CV-05842-JS-ST

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DORA CHAMPION, Individually and as Guardian of "GC"
a minor child under the age of 16 years,

Plaintiffs

-against-
OVZIE CANNON, Youth Services Specialist,
BERNARD JOHNSON, OCFS Caseworker,
ANITA SAPIO Facility Manager at BRC,
EDWARD FIGUEROA, Facility Director at BRC,
LOSECA AUSTRAL, PREA Compliance
Manager at BRC, Sarah Chin-Rokanova, R.N.
Tiffney Nerkowski Graf, Nurse Administrator at BRC,
"JOHN DOES" 1 - 10 and "JANE DOES"
1 – 10 such persons being employed as Staff, Supervisors,
and/or Administrators at the BRENTWOOD RESIDENTIAL
CENTER during the time "GC" was a resident at that facility.

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS**

**HEILIG BRANIGAN, LLP**
**Attorneys for Plaintiffs**

**Philip J. Branigan, Esq.**
**4250 Veterans Memorial Hwy., Suite 111E**
**Holbrook, New York 11741**
**(631) 750-6888**
**E: hbmlaw@optimum.net**

## Table of Contents

Table of Authorities                                                          4

Memorandum of Law in Opposition to the Defendants' Motion
to Dismiss the Second Amended Complaint                                       7

Statement of Facts                                                           9

Argument                                                                    14

Point 1 - There is no Lack of Subject Matter Jurisdiction.                  14

Point 2 -  Personal Involvement is Correctly Alleged in the SAC
(Answering Defendant's Point I).                                            14

Point 3 -  The Fourteenth Amendment Claims are Properly pled as part of the
Section 1983 Action (Answering Defendant's Point II).                       22

Point 4 - The Fourth Amendment Claim is properly pled (Answering
Defendant's Point III).                                                     24

Point 5 -  The SAC Adequately alleges that With the Requisite Degree of
Negligence (Answering Defendant's Point IV).                                25

Conclusion                                                                  27

Certification Pursuant to Local Rule 7.1.                                   28

2

Table of Authorities

**CASES**

*Aschcroft v. Iqbal*, 556 U.S. 662, 678 [2009] . . . . . . . . . . .    19

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 [2007] . . . . . . . . . . .    7

*Bell v. Wolfish*, 441 U. S. 520, 536-537 [1979] . . . . . . . . . .    15

*Brentwood Academy v. Tenn. Secondary Sch. Ath. Assn.,*
531 U.S. 288, 295 [2001] . . . . . . . . . . . . . . . . . . . . . .    17

*Conley v. Gibson*, 355 U. S. 41 [1957] . . . . . . . . . . . . . . . . . . . . .    7

*Daniels v. Williams*, 474 U. S. 327, [1986] . . . . . . . . . . . . . . . . . . . . .    25

*Darnell v. Pineiro*, 849 F3d 17 [2d Cir. 2017] . . . . . . . . . . . . . . . . . . . .    15, 25

*Frazier v. Coughlin*, 81 F3d 315 [2d Cir. 1996] . . . . . . . . . . . . . . . . . . . .    25

*Flannery v. County of Niagara,* 763 FSupp3ed 369, 389 [WDNY 2025]
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

*In re Gault*, 387 U. S. 1,13 [1967] . . . . . . . . . . . . . . . . . . . . . . . . . . . .    15

*Goldman v. Belden*, 754 F2d 1059, 1065 [2d Cir. 1985] . . . . . . . . . . . . . . .    19

*Goldstein v. Patacki*, 516 F3d 50, 56 [2d Cir. 2008] . . . . . . . . . . . . . . . . . .    19

*Graham v. Connor*, 490 U.S. 386, 394 [1989] . . . . . . . . . . . . . . . . . . . . .    23

*Hafer v. Melo*, 502 U. S. 21 [1991] . . . . . . . . . . . . . . . . . . . . . .    19

*Hernandez v. Keane*, 431 F3d 137 [2d Cir. 2003] . . . . . . . . . . . . . . . . . . . .    25

*J. M. v. Sessions*, 162 F4th 364 [2d Cir. 2025] . . . . . . . . . . . . . . . . . . . . .    16

*Kaplan v. Lebanese Canadian Bank, SAL*, 999 F3d 842, 864 [2d Cir. 2021] . . . 19

*Kingsly v. Hendrickson*, 576 U. S. 389 [2015] . . . . . . . . . . . . . . . . . . . . . 15

*LaBounty v. Coughlin*, 137 f3d 68, 72-73 [2d Cir. 1988] . . . . . . . . . . 21

*Miller v. Walpoff & Abramson, LLP.*, 321 F3d 292, 300 [2d Cir. 2003] . . . . . . 19

*Poe v. Leonard*, 282 F3d 123 [2d Cir. 2002] . . . . . . . . . . . . . . . . . . . . 25

*Salim v. Prolix*, 93 F3d 86 [2d Cir. 1986] . . . . . . . . . . . . . . . . . . . . 25

*Stone #1 v. Annucci*, 2021 WL 4463033, *8 [SDNY 2021] . . . . . . . . . . 18

*Tangreti v. Bachmann*, 983 F3d 609 [2d Cir. 2020] . . . . . . . . . . 18

*Walker v. NYS Justice Center* 493 F, Supp 3d 239 [SDNY 202] . . . . . . . . . . 18

*West v. Atkins*, 487 U.S. 42, 48 [1988] . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Youngberg v. Romeo*, 457 U. S. 307 [1982] . . . . . . . . . . . . . . . . . . . . . 16

**STATUTES**

28 U.S. CODE § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

28 U.S. CODE § 1343 [a][3]). . . . . . . . . . . . . . . . . . . . . . . . 14

28 U.S. CODE § 1983 . . . . . . . . . . . . . . . . . . . . . . .    2, 6, 8, 17, 18, 19, 22, 23, 25

34 U.S.C. ¶ 30301 et seq. [2003] . . . . . . . . . . . . . . . . . . . . . .    9, 13, 20

Family Court Act § 380.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Federal Rules of Civil Procedure §8[a][2] . . . . . . . . . . . . . . . . . . . . . . 7

Federal Rules of Civil Procedure § 12 (b)(1) . . . . . . . . . . . . . . . . . . . . 7

Federal Rules of Civil Procedure §12(b)(6) . . . . . . . . . . . . . . . . . . . . 7

Local Rule for the U.S. District Court for the
Eastern District of New York 7.1 . . . . . . . . . . . . . . . . . . . . . .   28

## CONSTITUTIONAL AUTHORITIES

Eighth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

Fourth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2, 8, 24

Fourteenth Amendment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   2, 8, 15, 16, 22

## OTHER SOURCES

Policy and Procedure Manuel (PPM) of BRC . . . . . . . . . . . . . . . . . . . . . .   9

Prison Rape Elimination Act (PREA) . . . . . . . . . . . . . . . . . . . . . . .   9, 13, 20

Memorandum of Law in Opposition to the Defendants' Motion
to Dismiss the Second Amended Complaint

This Memorandum of Law is submitted by the Plaintiffs-Dora Champion as the guardian of the minor child GC- to oppose OCFS's motion to dismiss parts of the Second Amended Complaint according to sections 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure (F.R.C.P.).[1] The Plaintiffs disagree with OCFS's factual recitations and its legal conclusions. There exists no basis to dismiss any part of the Second Amended Complaint. The F.R.C.P. do not require pleading facts constituting a cause of action; rather, the Rules require a "short and plain statement of the claim showing the pleader is entitled to relief" (F.R.C.P. §8[a][2]). The purpose of pleading under the Rules is to identify the transaction out of which the plaintiff's claims arise, so that the defendants have notice of the claims. The pleadings must only show that the pleader is entitled to relief, and that the allegations make the claim plausible (see, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 [2007], abrogating *Conley v. Gibson*, 355 U. S. 41 [1957]). Here the facts alleged on the face of the pleadings, together with the annexed exhibits, establish that GC's constitutional rights were violated when she was raped, and sexually

---

[1] The Plaintiffs adopt the Attorney General's nomenclature that all the defendants represented by the State will be called OCFS.

abused while she was a resident at the Brentwood Residential Center (BRC). GC is entitled to relief and the claims alleged are indeed plausible.

OCFS presents four substantive arguments in its motion. The first is that the various claims must fail because the acts attributable to each defendant are not clearly delineated, which deprives the complaint of the accuracy needed to go forward. Their argument is also that group pleading -where it is alleged that a group of people acted without a particular description of each person's involvement in the wrong- is insufficient to establish a claim. Second, The State argues that a claim cannot be based on the Fourteenth Amendment because only Section 1983 claims are permitted in a Section 1983 complaint. Third, there is no plausible Fourth Amendment Claim. And fourth, the complaint alleges mere negligence, which is insufficient to hold OCFS responsible for its employees' actions. Each of OCFS's arguments should fail because it is either factually erroneous, legally untenable, or both.

## Statement of Facts

Dora Champion is the mother of GC, a child who was 15 years old when she was raped, abused, and assaulted while in the care and custody of the State (Second Amended Complaint, hereinafter SAC, ¶ ¶ 8-9, 37-42). On October 22, 2022, GC was judged a juvenile delinquent by the Family Court, Suffolk County (SAC ¶ 36). On November 26, 2022, she was remanded to the Brentwood Residential Center (BRC), which is a residential facility run by New York State Office of Children and Family Services (OCFS) (SAC ¶¶ 8-9. 37-40). GC turned fifteen on November 29, 2022 (SAC ¶ 38). The BRC employees knew that GC was, according to the New York State Office of Temporary Disability Assistance (OTDA), considered the victim of sex trafficking; they also knew that she was intellectually disabled, and that she has a history of mental illness (SAC ¶¶ 32-35). GC's background made her a person at high risk of suffering abuse while confined at a residential facility (SAC ¶ 108).

The Policy and Procedure Manuel (PPM) of BRC and the Prison Rape Elimination Act (PREA), both prohibit personal/sexual relations between staff and residents at a youth residential facility, regardless of the willingness of the youth to participate in such activity (SAC ¶¶ 24-29). The applicable rules and regulations also require that a resident be put on suicide watch if they exhibit suicidal ideation (SAC ¶¶ 30, 44-50). Once on suicide watch the resident is supposed to be

8

evaluated regularly, preferably daily, by a clinician to determine if the suicide watch should continue (SAC ¶¶ 30, 46-47). At night, the person on suicide watch is supposed to be observed from the doorway of their room (SAC ¶¶, 50-53). To ensure that the applicable rules were being followed the Facility Manager (in this case Sapio [SAC ¶ ¶ 12, 26]), the Facility Director (in this case Figueroa [SAC ¶¶ 13, 25]), the Administrator on Duty or the Administrator on call (SAC ¶¶ 27, 28), were required to make regular inspections of the facility, including weekends and nights; a walk-through was intended for every fifteen minutes (SAC ¶ 31). Too, the administrators should have conducted random inspections to ensure compliance with the rules and regulations (SAC ¶106).

At BRC Cannon was a Youth Support Specialist (SAC ¶ 10). Through his contact with GC, he groomed her by exchanging phone access and edible THC for sexual favors (SAC ¶¶ 63-69). In December 2022 Cannon put GC on suicide watch (SAC ¶¶44-52). Thereafter and approximately forty-seven times Cannon had sexual relations with GC, in her room at night (SAC ¶ 69). He was not supposed to be in her room (SAC ¶¶ 30, 50-53), her door was not supposed to be shut (SAC ¶ 30), she was not supposed to make phone calls or eat THC edibles (SAC ¶¶ 65-69). All of these nefarious activities would have been obvious to any supervisor who made any of the required inspections at least once in the approximate thirty plus days on which Cannon committed his crimes (SAC ¶¶ 53-54). Additionally, if any

9

of the clinical or nursing supervisors had done their jobs, GC would have been checked to see if she needed to be on suicide watch. Instead, in derogation of the rules and regulations the administration of the BRC allowed this conduct to continue unabated.

Despite GC's troubled background, the BRC, through its employees, determined that one-on-one supervision of GC would be the job of Cannon (SAC ¶¶ 55-59). Despite Cannon, an adult man, being a prior felon, BRC still believed he was the appropriate person to supervise a minor female child (SAC ¶¶ 55-61). Furthermore, OCFS and Sapio and Figueroa allowed Cannon to be transferred to BRC after he was the subject of an inquiry about providing contraband to residents at another OFCS facility (SAC ¶ 61).

After speaking with her guardian, GC reported the rapes (SAC ¶¶ 70-72, 80-90), and her guardian-Dora Champion-notified an OCFS caseworker - Bernard Johnson- and the Suffolk County Police that GC had been raped (SAC ¶¶ 72-73). The day following the report of rape the police visited the BRC but, at the direction of the Facilities Director Figueroa, they were denied entry into the BRC (SAC ¶¶ 74-75). The next following day the police returned to the BRC and Figueroa allowed them entry, but he forbade any interaction with the staff at the facility (SAC ¶ 76).

The rules and procedures of both the BRC and OCFS require that a resident of a facility who reports that they are the victim of a sex crime be immediately sent off-campus to a hospital for medical evaluation and examination (SAC¶¶ 77, 83). These rules and procedures were not followed regarding GC (SAC ¶ 78). The caseworker- Bernard Johnson- did not have GC immediately removed from the facility. Facility Manager Sapio and Facility Director Figueroa determined that the policy of the BRC was not to send residents out for medical evaluation after a complaint of inappropriate sexual contact (SAC ¶ 79). This policy was followed by the administrator on duty (*Id.*). The day following GC's complaint the Day Nurse administrator – Ms. Nerkowski-Graf- came on duty and sent GC out of the facility for a medical examination (SAC ¶¶ 80-84). Nurse Graf had learned, before she sent GC out for her medical examination, that Sapio and Figueroa had directed that GC was not to be sent out for an examination and Graf was told by Figueroa that he and Sapio directed her not to send GC out of the facility (SAC ¶¶ 81-82). Facility Manager Sapio told Nurse Graf that she was not a team player because she sent GC out of the facility to be examined by a doctor (SAC ¶ 84).

After delayed medical testing, BRC determined that GC was pregnant, and she was released from BRC to her mother (SAC ¶¶ 85-90). GC had an abortion (*Id.*).

Additionally, it is well known that women in custody face an elevated risk of sexual abuse and retaliation in prison settings (SAC¶ ¶ 97, 99). All 50 States and

11

the District of Columbia have criminalized sexual contact between prisoners and facility staff (SAC ¶ 97). The risk of custodial sexual abuse led to the enactment of the Prison Rape Elimination Act (PREA) (34 U.S.C. ¶ 30301 et seq. [2003]) (*Id.*). Loseca Austral was the Facility PREA Compliance Manager at the BRC (SAC ¶ 14). There was no PREA training at the BRC until after GC made her complaint (SAC ¶ 116-118).

In 2022 a PREA Facility Audit was conducted at the BRC (SAC ¶¶ 100-107). The report noted that video cameras should be able to monitor all areas of the facility to eliminate any blind spots in the coverage (SAC ¶ 101). And the cameras are monitored 24 hours a day, seven days a week. Both Facility Director Figueroa and the administrator on duty have access to the video feed on their office computers (SAC ¶ 107). Additionally, the PREA report states that intermediate or higher-level supervisors must conduct and document unannounced rounds to identify and deter sexual abuse and sexual harassment (SAC ¶ 106).

The Justice Center investigated the complaint instituted by Dora Champion and GC (SAC ¶¶ 137-140). The Justice Center report found that two allegations regarding Cannon were substantiated (¶ ¶ 137-138). And the Justice Center found one allegation against the BRC was substantiated because there were substantial systemic problems including inadequate management, training, and supervision, which exposed GC to harm or the risk of harm (SAC ¶ 139).

## Argument

1. There is no Lack of Subject Matter Jurisdiction.

On page seven of its motion OCFS iterates that according to Rule 12 (b) (1) of the CPLR a cause of action must be dismissed when the district court lacks statutory or constitutional power to adjudicate the claim. OCFS, after citing authority in support of this statement, makes no argument that this Court lacks subject matter jurisdiction in this case. It is not clear if OCFS is asking that this case be dismissed because of a lack of subject matter jurisdiction, but in any case, subject matter jurisdiction is alleged and is established in this case (SAC ¶ 21). Plaintiff invoked this Court's subject matter jurisdiction because the claims made in the SAC are civil actions arising under the laws of the United States (28 U.S.C. §§ 1331 and 1343 [a][3]). The Defendants do not provide any argument countering Plaintiff's invocation of jurisdiction, and jurisdiction is proper in the Federal District Court.

2. Personal Involvement is Correctly Alleged in the SAC (Answering Defendant's Point I).

According to OCFS the personal involvement of the named defendants is not made sufficiently clear in the SAC. As a related argument the OCFS says that the pleadings are incorrect because the defendants are identified by groups and not

13

individually. Their arguments are the inverse sides of the same coin and do not withstand analysis. Read as a whole the SAC identifies the rules and requirements regulating the BRC, each party's role in the organization, and how failure to fulfill their respective roles led to the deprivation of GC's constitutional and statutory rights.

The BRC is not supposed to function as a prison and punish its residents. Due process of law (the Fourteenth Amendment) applies to juvenile proceedings (*In re Gault*, 387 U. S. 1,13 [1967]). Absent a conviction for a crime an inquiry into whether a person is detained by the state in violation of the Constitution is analyzed under the Fourteenth Amendment due process clause (*Bell v. Wolfish*, 441 U. S. 520, 536-537 [1979]). In New York, a person detained as a juvenile delinquent is not considered a prisoner because that person has neither been convicted of a crime nor is incarcerated (FCA § 380.1). A person not convicted of a crime cannot be punished in any manner (*Darnell v. Pineiro*, 849 F3d 17, 29-36 [2d Cir. 2017] [a pretrial detainee has not been convicted of any crime so Eighth Amendment does not apply, and conditions of confinement analyzed under Fourteenth Amendment]). Fourteenth Amendment inquiry usually focuses on whether conduct that is subject to review was objectively unreasonable. But a harm that is only negligently inflicted falls below the threshold for a constitutional violation (*Kingsly v. Hendrickson*, 576 U. S. 389 [201 5]). It is

14

immaterial whether a detainee is committed by court order (a juvenile delinquent) or whether it is a voluntary admission (at the request of a parent or guardian). Once a facility exercises sufficient control over the individual the Fourteenth Amendment applies (*Youngberg v. Romeo*, 457 U. S. 307 [1982] [ Fourteenth Amendment applies to person involuntarily committed]; *J. M. v. Sessions*, 162 F4th 364 [2d Cir. 2025]] Fourteenth Amendment applies to person voluntarily committed]).

The SAC does allege the personal involvement of the OCFS employees. Here it is alleged that the named defendants either actually inflicted the harm or had knowledge of the sensitive condition of GC and of the conduct of the person they supervised. Additionally, the supervisors failed in their independent duties to inspect and examine, which allowed Cannon to be with GC behind a closed door and at a minimum extended GC's time on suicide watch. For example, the Facility Manager and Facility Director did not perform the required inspections or require anyone else to conduct the inspections. If the inspections had been conducted the administrators would have seen that Cannon was staying with GC in her room, behind closed doors. Similarly, if the nurses or clinicians, and the manager or director had done their respective jobs, GC would not have been put on suicide watch by Cannon, and those same administrators would also have removed GC from the suicide watch. By not doing their jobs these people allowed Cannon to

15

essentially live with GC for over one month. Additionally, when GC was sent to the doctor the nurse who sent her did so despite the direction of the supervisors not to send GC, and afterward the nurse was called out by the supervisor for not being a team player (SAC ¶¶ 77-84). Similarly, the only person who determined if GC needed to be on, and remain on, suicide watch was Cannon, the very person who was sexually violating GC. Too, the third through fifth, and eight through eleventh claims allege that those acting in a supervisory capacity either created or allowed a policy or custom under which the Constitutional violations occurred or actively participated in the failure to follow both best practices and the established rules and regulations. In other words, the supervisors are liable either because their individual failures to do their respective jobs allowed GC to be put on suicide watch, prevented her from being removed from suicide watch, and allowed Cannon to stay in GC's bedroom without interruption, or because they failed to train and enforce the required policies. The named personnel failed to supervise and train to the extent that they created the environment and situation that allowed the abuse to occur and to continue.

To state a claim under 28 U.S.C. § 1983, a plaintiff must allege a violation of a right secured by the Constitution and laws of the United States, must show that the act was committed by a person, and that the person acted under the color of state law (*West v. Atkins*, 487 U.S. 42, 48 [1988]). There is no single test to identify state

action or state actors (*Brentwood Academy v. Tenn. Secondary Sch. Ath. Assn.*, 531 U.S. 288, 295 [2001]). A person involved in a supervisory capacity can be responsible for the deprivation of a Constitutionally protected right. In *Walker v. NYS Justice Center* (493 F, Supp 3d 239 [SDNY 202]) the court stated that a person could not be held liable under §1983 because they held a higher-up position. Rather, there must be personal involvement:

1. The defendant participated directly in the alleged constitutional violation.
2. The defendant, after being informed of the violation, failed to remedy the wrong.
3. The defendant created a policy or custom under which unconstitutional practices occurred or allowed the continuance of such policy or custom.
4. The defendant was grossly negligent in supervising subordinates who committed wrongful acts.
5. The defendant exhibited deliberate indifference to the rights of the plaintiff by failing to act on information indicating that unconstitutional acts were occurring.

While the full extent of the factors relating to supervisory liability is fluid after the Supreme Court's decision in *Ashcroft v. Iqbal* (556 U.S. 662 [2009]) , a supervisor can be responsible for their direct acts or if they created a policy or custom under which unconstitutional practices occurred or allowed the continuance of the policy or custom (*Stone #1 v. Annucci*, 2021 WL 4463033, *8 [SDNY 2021]). In other words, a supervisor can be responsible for the deprivation of a constitutional right if they had knowledge of the substantial risk and disregarded it (*Tangreti v. Bachmann*, 983 F3d 609 [2d Cir. 2020]). At the pleading stage, and regarding a motion to dismiss, general allegations of knowledge are allowed

17

because it is not possible to know the workings of a person's mind; facts are pled to give rise to the inference of knowledge (*Kaplan v. Lebanese Canadian Bank, SAL*, 999 F3d 842, 864 [2d Cir. 2021]).  A state officer can also be personally liable for damages under section 1983 for actions undertaken in their official capacities (*Hafer v. Melo*, 502 U. S. 21 [1991]). The Court must also accept the non-moving party's pleading as true and draw all inferences in the moving party's favor (see, *Miller v. Walpoff & Abramson, LLP*., 321 F3d 292, 300 [2d Cir. 2003]).

A motion made according to Rule 12(b)(6) is assessed on the face of the pleadings (*Goldman v. Belden*, 754 F2d 1059, 1065 [2d Cir. 1985]). The Court looks to the four corners of the complaint and is required to accept the plaintiff's non-conclusory factual allegations as true, and to consider those allegations in the light most favorable to the plaintiff (*Goldstein v. Patacki*, 516 F3d 50, 56 [2d Cir. 2008]). The complaint must allege sufficient facts to make the claim plausible on its face (*Aschcroft v. Iqbal*, 556 U.S. 662, 678 [2009]). Facial plausibility occurs when a plaintiff pleads factual content that leads to the reasonable inference that the defendant is liable for the alleged misconduct (*Ashcroft*, 556 U.S. at 570). OCFS's specific arguments are addressed as follows.

Johnson and Chin's personal involvement. Johnson was the caseworker who was notified by Dora Champion that GC, while a resident of the BRC, had been raped and sexually assaulted by an employee of the BRC (SAC ¶ 72). The rules

18

and regulations of the OCFS and the BRC require that upon notification that there is an allegation of a sexual incident the complainant is to be immediately sent to a hospital emergency room for examination (SAC ¶¶ 77-79). Johnson did not send GC to the hospital thereby violating the rules and regulations which are attendant to his employment. Johnson therefore directly participated in the constitutional violation, failed to take action to remediate the wrong, and was deliberately indifferent to GC by failing to act on the information that GC was the subject of harm. Similarly, the nurse Sarah Chin-Rokanova (and Nurse Graf), failed to conduct or have others conduct the required mental health evaluations of GC (SAC ¶ ¶46-48).

Loseca Austral was personally involved. Austral was the PREA Compliance manager at the BRC (SAC ¶ 14). Simply put, the BRC did not comply with the PREA because of its failures to monitor and inspect according to the rules and regulations of the OCFS and the BRC. PREA training was never held at the BRC prior to the complaints made in this case (SAC ¶¶ 117-118). The failure to enforce compliance and to train the staff at the BRC allowed the Cannon to isolate and rape GC and allowed Sapio and Figueroa to fail in their duties to inspect and enforce the rules; Sapio and Figueroa also allowed actions either allowed activities that became the de facto policy of the BRC.

19

Sapio and Figueroa are responsible because they did not fulfill any of their supervisory activities. Sapio and Figueroa knew or should have known that they allowed a known felon who had been the subject of an inquiry at his prior post within the state system to work at their facility (SAC ¶¶ 56-61). They know or should have known that GC had been the victim of sex trafficking and had mental health issue (SAC ¶¶ 32-35, 108). They did not require or conduct the random inspections that would have revealed that Cannon had essentially moved in with GC during the overnight supervision. They did not require the mandated mental health evaluations that could have removed GC from suicide watch and prevented the subsequent actions of Cannon (SAC ¶¶113-136). They did not enforce the rules and regulations that were in place specifically to deter and prevent the type of activity that occurred in this case (*Id.*). They acted to prevent GC from seeing doctor and reprimanded an employee that insisted that the rules requiring a visit to the hospital were enforced (SAC ¶¶ 77-84). Contrary to OCFS's opinion (at page x of their submission), the decision to try to prevent GC from seeing a doctor is not a post rape action with no bearing on the complaint in this case; rather, it is part of the deprivation of GC's rights. The Plaintiffs do not agree that the constitutional violations concluded with the termination of the sex act itself. Also, it is noteworthy that Johson apparently followed the policy of the BRC and did not send GC out to see a doctor. The way Sapio and Figueroa ran the BRC put the

20

health and safety of GC in danger (*LaBounty v. Coughlin*, 137 f3d 68, 72-73 [2d Cir. 1988] [deliberate indifference placing health and safety in danger]).

In this case the factual allegations contained in the SAC outline the responsibilities of each staff member of the BRC. They are collected in the several numbered claims to identify the actors in each claim. But each claim noted that it also relies on the prior recitation of factual allegations in the complaint. As outlined above each actor played a specific part in the deprivation of GC's rights. Plaintiffs maintain that each defendant is put on notice of the conduct that constitutes the claims lodged against them. As such the motion to dismiss on this ground should be denied.

3. The Fourteenth Amendment Claims are Properly pled as part of the Section 1983 Action (Answering Defendant's Point II).

Contrary to the defendant's argument no claims in the SAC are brought directly under the Fourteenth Amendment. Paragraph 1 of the SAC states that this case is a civil rights action and in paragraph 21 we note that this action is based on Section 1983. We contend that there is no doubt that this is a civil rights action brought according to 42 U.S.C. ¶ 1983. Section 1983 does not define a person's constitutional rights. It is only a mechanism to bring a claim that a constitutional or statutory right has been violated into the federal courts (*Flannery v. County of*

*Niagara,* 763 FSupp3ed 369, 389 [WDNY 2025]). When pleading a cause of action, the specific constitutional or statutory right does not have to be explicitly cited, but it is preferable to alert the defendant to the specific source of the right that is allegedly violated (*Graham v. Connor*, 490 U.S. 386, 394 [1989] [first step in 1983 action is to identify the constitutional right allegedly infringed]). In this case, to make the source of the right that is violated clear, the Plaintiffs identified the specific source of the right. OCFS's analysis is, therefore, erroneous.

OCFS's secondary argument, that the counts are duplicative, is likewise erroneous. Initially we note that counts 2 and 4 relate only to Cannon and are not the subject of OCFS's motion to dismiss. Counts 3, 4, and 5, allege civil rights violations for, respectively: cumulative failures that led to the deprivation of GC's constitutional rights; the de facto policy that led to the failures to discipline and investigate that led to the unjustified use of force or punishment; and the failure to train and supervise. Count 6 relates the failure to investigate Cannon's background which led to him being able to violate GC's bodily integrity. Count 8, describes the failures that led to the physical and psychological harm caused to GC. Count 9 refers to the failure to protect due to the lack of proper oversight and random inspections. Count 10 refers to the failure to institute appropriate policies. And Count 11 simply highlights the deliberate indifference of the administrators of the

22

BRC. There is no duplication of the allegations, and each count addresses a

separate aspect of the failures of the respective persons at the BRC.

4. The Fourth Amendment Claim is properly pled (Answering Defendant's Point III).

OCFS argues that in Count 1 of the SAC the acts of the individual persons are not delineated (a reprise of Point I of their motion), and that there cannot be a Fourth Amendment claim because there was not a seizure cognizable under that rubric.

Plaintiff's theory throughout this complaint is that the various administrators and employees of the BRC each failed in their specific obligations to GC and allowed Cannon to violate her bodily integrity. For example, the failure of Sapio and Figueroa to correctly vet Cannon for his employment and transfer to the BRC, put him in a position to take advantage of GC. The administrators (Sapio and Figueroa) allowed Cannon to have one-on-one access to GC by either having a de facto policy that allowed such conduct, or by failing to enforce the required policies. The nurse Graf and Chin- Rokanova failed to examine GC to see if she should continue to be allowed to be supervised by Cannon, and Cannon isolated GC and raped and sexually assaulted her. When read in its entirety the SAC delineates the respective roles of the defendants and the reasons for their inclusion in this case.

Contrary to the Defendant's claims, GC was restrained and segregated to the extent that she was unable to protect herself from Cannon. Confinement or restraint that is atypical and a significant hardship, and that is contrary to a rule or regulation regarding a detainee's conduct or housing, violates a protected liberty interest in remaining free from unnecessary confinement or restraint (*Frazier v. Coughlin*, 81 F3d 315 [2d Cir. 1996]). Cannon was allowed to be alone with GC in a non-monitored space where he controlled her ability to either flee or ask for help.

5. The SAC Adequately alleges that With the Requisite Degree of Negligence (Answering Defendant's Point IV).

Plaintiffs do not dispute that mere negligence does not establish grounds for Section 1983 relief (*Daniels v. Williams*, 474 U. S. 327, [1986] [ due process not implicated by a negligent act or omission]]; S*alim v. Prolix*, 93 F3d 86 [2d Cir. 1986]). Instead, the state official must act with deliberate indifference (*Hernandez v. Keane*, 431 F3d 137 [2d Cir. 2003]; *Poe v. Leonard*, 282 F3d 123 [2d Cir. 2002]). Deliberate indifference is generally defined as either an intentional act to reach an outcome, or the reckless failure to mitigate a condition that the official either knew or should have known posed a risk to health or safety (*Darnell v. Pineiro*, 849 F3d 17 [2d Cir. 2017]).

The complaint in this case establishes that the various state actors -as described above- each acted in a manner that was intentionally detrimental or deliberately indifferent to the health and safety of GC. Sapio and Figueroa brought Cannon to the facility, they failed to enforce any rules and regulations to ensure resident safety or allowed a de facto policy that allowed aberrant conduct. They did not provide sufficient medical care and tried to prevent revelation of the lack of safety and care by keeping events "in house." The nurses did not have GC examined and the caseworker failed to have GC immediately removed to a hospital. These factors, and others alleged above and, in the SAC, established, for pleading purposes, the requisite degree of deliberate indifference to the health and safety of GC.

## Conclusion

For the reasons stated herein OCFS's motion to dismiss the SAC should be denied in its entirety.

**Certification Pursuant to Local Rule 7.1.**

CERTIFICATION PURSUANT TO LOCAL RULE 7.1 In accordance with the Local Rule for the U.S. District Court for the Eastern District of New York 7.1, the undersigned certifies that the word count in this Memorandum of Law (excluding the caption, table of contents, table of authorities, signature block, and this certification), as established using the word count on the word-processing system used to prepare it, is 4,895 words.

Dated: Holbrook, New York
      June 24, 2026

By: _____
Philip J. Branigan
Attorney for Plaintiffs